UNITED STATES, Appellee,

v.

Steve R. HESSLER, Private, U. S. Army, Appellant.

No. 31,788.

SPCM 10427.

U. S. Court of Military Appeals.

April 3, 1978.

Captain Ralph E. Sharpe argued the cause for Appellant, Accused. With him on the brief were Colonel Alton H. Harvey, Lieutenant Colonel John R. Thornock, and Major Richard J. Goddard.

Captain Stephen S. Phillips argued the cause for Appellee, United States. With him on the brief were Lieutenant Colonel Donald W. Hansen, Major John T. Sherwood, Jr., Major Steven M. Werner, Captain William C. Kirk, and Captain Regis J. McCoy.

## Opinion

COOK, Judge:

The Court granted review to consider two assignments of error in regard to accused's conviction by a special court-martial for wrongful possession of marihuana, in violation of Army Regulation 600–50, change 2, April 19, 1973.

The accused's first contention is that evidence obtained in a search of his person was improperly admitted by the trial judge over defense objection. We conclude the search was lawful.

The challenged evidence was obtained by Second Lieutenant T. W. Hunter while on duty as squadron duty officer for the 3rd Squadron, 8th Cavalry. At about 5:00 p. m., accompanied by the charge of quarters, Sergeant Dempsey, Hunter entered the billets of Troop C for the first of two "before midnight" checks to determine its general cleanliness, the presence of unauthorized visitors, the inordinately loud playing of music, "or anything illegal." After the Lieutenant had inspected the latrine "to make sure it was clean," he proceeded to the upstairs area. On the stairway, he detected an odor which, on the basis of previous experience, he concluded was "marihuana, hashish." Moving along the upstairs hallway, the odor "became stronger," until he reached a point where he "knew" the source was "in the area." There were four rooms at this part of the hallway; the door of each was closed. Other relevant facts are set out under the separate headings of this opinion and in the following excerpt from appellate defense counsel's brief:

[Hunter] knocked on one door and there was no answer (R. 16). He then moved to another room door, heard music coming from within it, and knocked on that door. A voice from inside said "Who is it?", and Lieutenant Hunter then knocked again and said "Open the door". After the voice from inside again asked "Who is it?", Sergeant Dempsey identified himself as the CQ and the door was opened from the inside (R. 16). Lieutenant Hunter and Sergeant Dempsey then entered the room.

*Hunter's Entry Upon the Common Ways of the Billets.*

█ Positioned in a place where he has a right to be, a Government agent is entitled to use his regular senses and to take cognizance of information gleaned from such use. *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *United States v. Mathis,* 16 U.S.C.M.A. 522, 37 C.M.R. 142 (1967). This concept is popularly described as the "plain view" doctrine. Here, the outside door to the troop billets was locked. Lieutenant Hunter gained entry by directing Sergeant Dempsey to open it with a "master" key. Hunter's testimony indicates that written instructions, described as an "SOP" (Standard Operating Procedure) which defined the responsibilities of the squadron duty officer, required him to check the interior of the billets. The SOP was not introduced, and no information was presented as to its unavailability. As far as we have been able to ascertain, there is no official regulation or publication, subject to judicial notice, which specifies the responsibilities of a unit duty officer. The Dictionary of United States Army Terms, Army Regulation 310–25, June 1972, at 194, notes that a duty officer is one "detailed to be constantly available for call in emergencies

during a specific period." That definition does not indicate that the office carries authority to enter locked billets for non-emergency purposes. However, Hunter's testimony clearly implies that his enumeration of the authority of the squadron duty officer was that contained in the SOP.

■ No defense objection was made to Hunter's testimony as to the SOP on the ground that the writing was the best evidence of its content. In the absence of such objection, the testimony was competent to establish Hunter's authority to enter the locked billets and, at least, move along the common areaways. *United States v. Lowery*, 2 U.S.C.M.A. 315, 8 C.M.R. 115 (1953). As he was lawfully at the places in the billets where he detected the odor of burning marihuana, he could legally take account of the information conveyed by his senses. *Cf. United States v. Case*, 435 F.2d 766 (7th Cir. 1970).

*The Entry Into the Room in Which the Accused was Present.*

As noted earlier, Hunter testified he had previous experience with the odor of burning marihuana. Appellate defense counsel concede Hunter's expertise was not contested at trial, and that he indeed "had probable cause to believe that an unlawful substance was being burned somewhere in the barracks that night." However, counsel contend that Hunter's actions after determining the likely source of the odor "were unreasonable and violative of the Fourth Amendment" because he acted without a warrant and in the absence of exigent circumstances.

■ The authority of a commissioned officer to apprehend another for a military offense is embraced within the same provi-

sions of the Uniform Code of Military Justice and the Manual for Courts-Martial that confer authority to search upon persons performing police and criminal investigative duties. Article 7, Uniform Code of Military Justice, 10 U.S.C. § 807; paragraph 19*a*, Manual for Courts-Martial, United States, 1969 (Revised edition). The Uniform Code confers general authority to apprehend upon any person "authorized under regulations governing the armed forces"; the Manual, promulgated by the President for the "armed forces" in furtherance of "the authority vested" by the Code, provides the specific enumeration. In pertinent part, the Manual vests authority to apprehend in "[a]ll commissioned officers . . . and, when in the execution of their . . . police duties, . . . such persons as are designated . . . to perform . . . police duties, including duties as criminal investigators." Paragraph 19, Manual, *supra.* The authority is exercisable "upon reasonable belief that an offense has been committed and that the person apprehended committed it." Article 7, UCMJ. As a commissioned officer, therefore, Lieutenant Hunter had the equivalent authority of a police officer.

Relying upon *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), the accused contends that Hunter should not have demanded entrance into the room without first obtaining authority to search. Perceiving the facts in this case as "parallel" to those in *Johnson,* the dissent accepts that contention. I view the facts differently and conclude that *Johnson* is inapposite.[1]

In *Johnson,* a confidential informant reported to Lieutenant Belland, a Seattle police officer on narcotic detail, that unknown persons were smoking opium in a room at

1. *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), was decided by a 5–4 vote. Although the result reached by the Court as regards the search of the room as incident to arrest of the occupant might be the same under *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), I believe the opinion would not survive re-examination on the question of whether the arrest of the occupant was valid. As the majority acknowl-

edged, the officers had probable cause to believe that a crime was in progress on the other side of the door that separated them from the scene. In that circumstance, I believe they could properly "demand entrance in the name of the law." *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948). For purposes of this appeal, I accept *Johnson* as it is.

the Europe Hotel. The informant was taken back to the hotel to speak with the manager but he immediately returned to report he had detected the odor of burning opium in the hallway. Had Lieutenant Belland then and there sought entry into the room, *Johnson* would be more like this case than it is. What Belland did distinguishes this case, in my opinion, from *Johnson.*

Belland left the hotel. Between an hour and an hour and a half later, he returned with four federal agents; all "recognized at once a strong odor of burning opium." *Id.* at 12, 68 S.Ct. at 368. An officer knocked on the door and received an immediate response asking who was there. Lieutenant Belland replied by stating his rank and name. A "slight delay" ensued, during which the officers heard "some 'shuffling or noise'" in the room. *Id.* The door was opened by the defendant. Belland said he wanted to talk to her; as she stepped back, the officers entered. The Supreme Court acknowledged that circumstances exist "in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with" but it concluded the circumstances before it did not amount to "such a case." *Id.* at 14–15, 68 S.Ct. at 369.

It seems to me that looking at what Belland did when first confronted with the odor of opium and considering the long interval of time between that evidence and his entry into the room, the Supreme Court had simply concluded that no exigent circumstances justified Belland's belated demand for admission into the room on his own authority as a police officer. As I shall presently note, in this case there was no break in the chain of events and no break in the time between exposure to evidence of the probability of a crime in progress and the demand to be admitted to the room. To stake out the premises, as suggested by the accused, and delay entry until authorization to arrest and search could be obtained from a non-police official was "full of dangers" that were likely to frustrate "the police entry when it finally" came. *United States v. Johnson,* 182 U.S.App.D.C. 383, 561 F.2d

832, 844 (1977), *cert. denied* 432 U.S. 907, 97 S.Ct. 2953, 53 L.Ed.2d 1080 (1977). Here there was an uninterrupted progression of events providing probable cause to believe a crime was in progress, analogous to that of a police officer, who, while passing on the street hears a shout and a cry for help coming from a house; such circumstances, said the Supreme Court, sanction an immediate "demand [for] entrance in the name of the law." *McDonald v. United States,* 335 U.S. 451, 454, 69 S.Ct. 191, 192, 93 L.Ed. 153 (1948).

■ Had Hunter, while in the hallway, come upon a serviceman smoking a cigarette which gave off the odor of marihuana, I have no doubt he could immediately have apprehended the individual. Hunter did not have direct visual perception of a wrongdoer; but, he was confronted with facts that established that marihuana was probably being burned in one of the three remaining rooms opening into the part of the hallway in which he stood. He knocked at one of the doors. That action was manifestly proper and within Hunter's authority to investigate. The door was not opened for about a minute and a half. In the interval, Hunter heard the sound of a window being opened in the room. It seems to me the trial judge could properly find Lieutenant Hunter could reasonably anticipate that if the crime was being committed behind the door on which he had knocked, evidence of it was being disposed of. Plainly, *immediate* steps had to be taken to preserve that evidence. I am convinced, therefore, that Hunter's entry into the room was reasonable and constitutionally valid.

*The Search of the Accused's Person.*

■ Immediately upon entering the room, Lieutenant Hunter determined that the odor of burning marihuana "was quite obvious" and "much stronger" than it had been in the hallway. He also noted that a window in the far corner of the room was open. Six persons were present; one was a female, whose presence in the billets was

"against squadron policy," and two were known by Hunter to have been involved "in many drug-related incidents." He "told everyone to freeze." We need not decide whether this order constituted an apprehension, and, as such, might validate the subsequent search of the accused's person as a search incident to lawful apprehension. Compare Gustafson v. Florida, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973), with United States v. Kinane, 1 M.J. 309 (C.M.A. 1976). A police officer having probable cause to investigate the probable commission of a crime can use reasonable restraint "to maintain the status quo momentarily while obtaining more information." Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); United States v. Purry, 178 U.S.App.D.C. 139, 545 F.2d 217 (1976). The degree of restraint imposed by the order "to freeze" was, in our opinion, justified by the circumstances.

■ Before the search of accused's person, the accused had exhibited a reluctance to face the Lieutenant; and, when he moved, he kept his back toward the Lieutenant. Finally, when directed to turn around to face Hunter, he "made a gesture in his groin region" before he complied. Thereupon he was ordered to lower his trousers. After some evasiveness, he "reached" into the trousers and "handed over this plastic bag." These actions by the accused must be taken into account in considering whether probable cause existed to search his person. United States v. Johnson, 148 U.S.App.D.C. 205, 207, 459 F.2d 1229, 1231 (1972); People v. DeBour, 40 N.Y.2d 210, 386 N.Y.S.2d 375, 387, 352 N.E.2d 562, 574 (1976). Viewing the totality of the circumstances that confronted Hunter, we are satisfied there was probable cause to search the accused and that the exigencies of the situation were such that authority from an official competent to authorize the search was not a necessary precondition.

In a second assignment of error the accused contends he was prejudiced by certain deficiencies in the staff judge advocate's post-trial advice to the convening authority. We have examined the advice and considered the probable prejudicial effect of the alleged inadequacies and are satisfied that corrective action is not warranted.

The decision of the United States Army Court of Military Review is affirmed.

FLETCHER, Chief Judge (concurring in the result):

It is imperative that as one of the writers in United States v. Thomas, 1 M.J. 397 (C.M.A. 1976), I distinguish my thinking in that opinion from the situation developed here. In Thomas as well as Roberts[1] there was no demonstrable present danger warranting the "fishing expedition" by the inspecting dog. It should be noted in both Thomas and Roberts that an instrumentality, i. e., the dog, was used for the invasion of privacy and that this hostile ingress gave rise to the foundation to issue a search warrant. This is totally contrary to the concept expressed by the Supreme Court in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) that the Fourth Amendment protects persons, not places, from unreasonable searches and seizures. I believe still, as I articulated in Thomas, that "military necessity" gives rise to an exception to the Fourth Amendment not mirrored in the civilian sector. Those fundamentals which precipitated this exception should be restated herein:

> It could hardly be argued that a military commander lacks a legitimate, substantial interest in assuring . . . that he can field an effective fighting force on a moment's notice to defend the very liberties of the American citizenry with which we deal in instances such as the present case. . . . Thus, he [the commander] must be afforded additional leeway, even if not available in civilian jurisdictions, to regulate the off-duty, on-base conduct of his "employees" where such conduct has a direct bearing upon the serviceman's ability to perform his military duties. (Footnotes omitted.) 1 M.J. at 403–4.

---

1. United States v. Roberts, 2 M.J. 31 (C.M.A. 1976).

Paramount to the fulfillment of the obligation to defend the civilian community shouldered by the military services is the interdependent relationship of each serviceperson's duty to act in concert with other servicepersons. Where one part of the pyramid which provides the fulcrum upon which the lever of defense rests is not present, there is no effective defense. This high degree of interdependence is not present in the general society.

We are confronted here with the all-too-familiar necessity of reconciling a legitimate need of constant military preparedness with rights provided under the United States Constitution. I should note that the Uniform Code of Military Justice is silent regarding the Fourth Amendment to the Constitution. Those Fourth Amendment rights reserved to an individual serviceperson have been preserved either by court decision, the Manual for Courts-Martial, or service regulations.

The military's standard for a rule different from its civilian counterpart as to access to communal living quarters must be weighed, in terms of probable cause to issue a search warrant, against a flexible standard of reasonableness that takes into account the societal need for effective enforcement of a particular obligation of readiness. In applying any reasonableness standard, an argument that the public interest demands a particular rule must receive careful consideration. It is not sufficient to rely upon precedent which creates a standard of conduct wherein the societal interests are different. I believe that the societal interest is impaired where assigned living quarters in a communal type building are sacrosanct as positioned against the stated objective of that society.[2] To so hold is to give stature to individual rights which vitiate the requirements for personal inter-

reliance. This interdependence is the bulwark of the military obligation.

Foremost to any consideration of the Fourth Amendment is that the proscription lies against unreasonable searches.[3] Justice Black, concurring and dissenting in *Coolidge v. New Hampshire*, 403 U.S. 443, 493, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) stated:

> [T]he Fourth Amendment does not require that every search be made pursuant to a warrant. It prohibits only "*unreasonable* * searches and seizures." The relevant test *is not the reasonableness of the opportunity to procure a warrant,* * but the reasonableness of the seizure under all the circumstances. The test of reasonableness cannot be fixed by *per se* rules; each case must be decided on its own facts. (*Id.* at 509–10, 91 S.Ct. at 2060.)

I conclude that the actions of the squadron duty officer, insuring the fulfillment of the obligation of readiness, require a finding that the intrusion was not unreasonable. In *Thomas*, the contraband was dormant and posed no *present danger* to the holder or other service members that depend upon him. In this case the contraband had been activated, posing a *present danger* not only to the user but to all persons who must interact with him to accomplish the societies' desired objective.

PERRY, Judge (dissenting):

As Lieutenant Hunter failed to obtain a judicial warrant or any other counterpart authorization from a neutral and detached person prior to his entering the room in question, and as none of the recognized, narrowly defined exceptions to the warrant requirement are sustainable factually in this case, Lieutenant Hunter's search was, *ipso facto,* unreasonable within the meaning

---

2. *See Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

3. *Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967), and *United States v.*

*Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

* Emphasis added.

of the Fourth Amendment[1] of the United States Constitution.[2] I, therefore, respectfully dissent.

## I

On April 28, 1974, Second Lieutenant Terry Hunter was the duty officer for 3d Squadron, 8th Calvary, in Germany. He testified at the appellant's trial that his duties in that connection included making two checks of the billets before midnight and one thereafter; checking the ammo dump to insure it was secure; and assuring himself that the guards were doing their job and that the noncommissioned officer in charge (NCOIC) was performing his duties. Concerning the billets checks, Lieutenant Hunter described his function as follows:

> To make sure, one thing to check for in the billets is make sure you don't have any visitors from any outside unit or from another troop without going through the CQ [charge-of-quarters] and make sure to check the armsroom and make sure the CQ has checked the armsroom and also check for the welfare of the people. Make sure if a guy has a loud stereo, make sure it's not disturbing his roommate or the next guy or anything illegal going on.

He subsequently reiterated two of these general duties in response to a question from the appellant's counsel on cross-examination addressing what, if anything, the procedure required regarding the duty officer's conducting a search for contraband:

> Contraband and searches? To look out for the welfare of the people, you are to check the area for anything illegal going on in the building. Okay, you find a fight going on, anything like that, you're to get the CQ and take appropriate measures. Call and notify the squadron if anything comes up, which I did, Major Vespia, the squadron XO [executive officer], and so as far as searches go, no, it doesn't give your rule how to go about it.

In fulfillment of these duties as squadron duty officer, Lieutenant Hunter began one of his pre-midnight checks of the billets, accompanied by the Charge of Quarters, Sergeant Dempsey, approximately 5:00 on the evening of April 28. When he began the check of the barracks in which the search in question ultimately occurred, Lieutenant Hunter had Sergeant Dempsey unlock the building's outside door and they proceeded up the stairway. As they did so, Lieutenant Hunter noticed what he described as a "peculiar smell". He said that as he rounded the corner and moved down the hall, he identified the smell as burning "drugs, marihuana, hashish." He described the subsequent events as follows:

> A. As I was going down the hall it became stronger and I kept on going on down the hall and I went down to the last room and knocked on the

---

1. Amendment IV, Constitution of the United States, provides:

   The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

   The Amendment applies in the military, as well as in the civilian community. *United States v. Unrue*, 22 U.S.C.M.A. 466, 468, 47 C.M.R. 556, 558 (1973).

2. I must expressly reject at the outset the novel suggestion by the Chief Judge, which I believe to be implicit in his opinion, that the Fourth Amendment to the Constitution of the United States may not apply at all to servicepersons. I find wholly immaterial what Chief Judge Fletcher apparently finds at least interesting: that the Uniform Code of Military Justice is silent on the Fourth Amendment. I believe that the Constitution, complete with all its Amendments, is quite capable of standing on its own and needs no Congressional statute, executive order, or judicial decision to make its cherished protections viable. Unlike that found in the Fifth Amendment, there is no excepted class of citizens in the Fourth Amendment and I have no doubt that our Founding Fathers would have penned one in, as they did in the Fifth, had they intended such an exception to exist. While the Fourth Amendment itself ably and independently creates the protection, constant vigilance by all citizens and all branches of our Government at all levels is required to safeguard it.

door.[3] There was no answer. I listened and there was no one, it turned out there was no one in the room and from next door we heard music coming from it and we went up there and knocked on the door and they said, "Who is it?" I knocked on the door again. I said, "Open the door." They said, "Who is it?" and then Sergeant Dempsey said it was the CQ and they opened the door and we walked in.

Q: How long did it take them to open the door?

A: From the time we first knocked, about a minute to a minute and a half.

Q: Did you attempt to open the door by any other means?

A: I tried it first and it was locked. I said to Sergeant Dempsey to go ahead and get the master key out. I'm pretty much of a polite person and I usually knock before I enter a room. That's just a policy that I have, you know.

Q: Are the doors to the rooms supposed to be locked when people are in them?

A: No, it's supposed to be unlocked.

Q: Describe your actions once the door was opened and you walked in the room.

A: Okay, I walked in the room and the smell was quite obvious.

Q: Was it much stronger or not very much stronger?

A: I'd say it was much stronger.

3. What was in Lieutenant Hunter's mind as he walked down the hallway in search of the source of the smell is revealed in the following portion of his subsequent testimony:

Okay it was, you come up the stairs and turn and you got a long hallway, right, and as I was walking down the hall it was getting stronger and stronger. Okay, I passed this room and went to the last room and it was getting stronger and stronger and I was, I don't know whether I was exhaling when I went past their room or what, but I didn't, I went on down to the last room and tried it.

Because he "was just positive it [marihuana] was in there [the room in question]"—inasmuch as he was "positive" that the odor was stronger in the room than it was in the hallway—Lieutenant Hunter "told everyone to freeze" and began a thorough search of the room and of all six persons therein,[4] while Sergeant Dempsey left to solicit the aid of the military police. Ultimately, Lieutenant Hunter discovered the marihuana in question tucked inside the appellant's pants.

The following two excerpts from his testimony confirm that the purpose of Lieutenant Hunter's actions at the end of the hallway was to discover the source of the odor he had identified to himself as burning marihuana, and that at the point at which this exercise began, he had no idea which of four possible rooms was his target:

Q: Now, did you go in the room because of the music?

A: No, I was trying to find out what the smell was coming from.

Q: So you don't know if it was that room that you entered?

A: I knew it was in this area of the hall. There were four rooms that it could be, right, so hit or miss, if there had been no one smoking in one room I would have gone to the next until I found the room it was coming from.

\* \* \* \* \* \*

Q: Other than the odor, were there any other indications hash was being used in that room?

A: No, just, I had no idea, you know. It could have been in another room. It was the smell in the hall and I was trying to find out where it was com-

4. It appears from Lieutenant Hunter's testimony that it was the increased strength of the odor as he entered the room that caused him to believe that he had located the source of that odor. However, his suspicions seem to have been reinforced, from his testimony, by the presence in the room of two men he believed from prior exposure to be involved in the drug community—neither of which was the appellant, whom he never had seen prior to this incident—and of a German national woman, who was in the room in contravention of unit policy.

ing from, which room it was coming from. I opened the door and I was lucky my first try. I entered the room and there I discovered the smell was more—

MJ: Was it the second room?

A: It was the second. The first room I entered. The first door I tried was locked and I listened and no one was inside.

## II

It is preferred in the law that a search [5] of an area in which an individual has a reasonable expectation of privacy [6] be pursuant to judicial authorization in the form of a warrant based upon probable cause.[7] *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). As the United States Supreme Court explained in *Camara v. Municipal Court*, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967):

> Though there has been general agreement as to the fundamental purpose of the Fourth Amendment, translation of the abstract prohibition against 'unreasonable searches and seizures' into workable guidelines for the decision of particular cases is a difficult task which has for many years divided the members of this

---

**5.** Lieutenant Hunter's testimony leaves no doubt that from the point when he first identified the odor as burned marihuana or hashish, he had one objective in mind: finding the source of the odor. In other words, his objective was to locate evidence of a crime. As such, whatever were his general duties as a squadron duty officer, his actions in knocking on the door and gaining access to the interior of the room in furtherance of that objective constituted a search, notwithstanding the Government's suggested label of a "security inspection." *See United States v. Roberts*, 2 M.J. 31 (C.M.A.1976); *United States v. Grace*, 19 U.S.C.M.A. 409, 42 C.M.R. 11 (1970); and *United States v. Lange*, 15 U.S.C.M.A. 486, 35 C.M.R. 458 (1965). Neither the opinions of the other judges of this Court nor the unpublished opinion of the Army Court of Military Review characterize or treat this action otherwise.

**6.** When a serviceperson is provided with a private or semiprivate room, as opposed to an open barracks, complete with a door for shutting out the viewable public, that individual normally has some reasonable expectation of privacy. I do not ignore the difference between the military and civilian societies and the concomitant compromise in that expectation of privacy in the former. *See, e. g.,* my remarks in *United States v. Roberts, supra* at 36 (emphasis added):

> While *the traditional military inspection* which looks at the overall fitness of a unit to perform its military mission *is a permissible deviation from what may be tolerated in a civilian society generally*—recognizing that *such procedure is a reasonable intrusion which a serviceperson must expect in a military society*—the 'shakedown inspection' as earlier defined in search specifically of criminal goods or evidence is not such a permissible intrusion into a person's reasonable expectation of privacy, even in the military setting.

However, as I stated in *Roberts, supra* at 35–6 (footnote omitted):

> It may well be, as the United States Court of Appeals for the District of Columbia suggested in *Committee for G. I. Rights v. Callaway*, 171 U.S.App.D.C. 73, 518 F.2d 466, 477 (1975), that the 'soldier cannot reasonably expect the Army barracks to be a sanctuary like his civilian home,' but military quarters have some aspects of a dwelling or a home and in those respects the military member may reasonably expect privacy protected by the Fourth Amendment.

In this case, there is no evidence of record that it was part of Lieutenant Hunter's routine inspection to open closed doors to living quarters and either to peer into or to enter them. (In fact, the suggestion is to the contrary, from his testimony contrasting his duties as squadron duty officer in his present unit with similar duties he once had performed in another unit. He noted that in the former unit he was required by its SOP "to go into every room" during the checks and "if a door was locked the door came off its hinges."). Thus, I am convinced that the appellant possessed a reasonable expectation of privacy behind the closed door.

**7.** While I have serious reservations under the facts of this case concerning Lieutenant Hunter's probable cause to search this particular room, *see United States v. Roberts, supra* at 33, regarding the unreasonableness and unconstitutionality of general exploratory searches, I shall assume he possessed the requisite cause for purposes of this discussion. *But see Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); *Johnson v. United States, supra*; and *Taylor v. United States*, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932), where a distinctive odor of alcohol or drugs *emanating from a particular and identifiable source* was a factor *contributing* to a conclusion of probable cause.

Court. Nevertheless, one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant. *See, e. g., Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856; *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59; *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153; *Agnello v. United States,* 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145.

The Supreme Court recently reaffirmed the above principle in *United States v. Chadwick,* 433 U.S. 1, 9, 97 S.Ct. 2476, 2482, 53 L.Ed.2d 538 (1977), stating:

Our fundamental inquiry in considering Fourth Amendment issues is whether or not a search or seizure is reasonable under all the circumstances. *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). The judicial warrant has a significant role to play in that it provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out

crime.' *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

The Court concluded, as follows, even in recognition that "on this record the issuance of a warrant by a judicial officer was reasonably predictable": [8]

There being no exigency,. it was unreasonable for the Government to conduct this search without the safeguards a judicial warrant provides.

In this case, however, as is clear from the recounted portion of Lieutenant Hunter's testimony, Lieutenant Hunter did not seek the authorization of anyone neutral and detached prior to the moment he entered the room.[9] In other words, no warrant or facsimile thereof was procured by Lieutenant Hunter. As such, this "reduce[d] the possible justifications for this search to three of the warrantless exceptions to the Fourth Amendment: a consent search, a necessity search, or a search incident to apprehension or custodial arrest." *United States v. Kinane,* 1 M.J. 309, 311–312 (C.M. A.1976). In considering the possible relevance in this case of one or more of these exceptions, it must be remembered that the burden is upon the Government to demonstrate the applicability of an exception to the warrant requirement. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29

---

8. *United States v. Chadwick,* 433 U.S. 1, 15, 97 S.Ct. 2476, 2486, 53 L.Ed.2d 538 (1977).

9. The parties before this Court have disputed Lieutenant Hunter's authority as squadron duty officer. In doing so, however, a critical distinction has been blurred. In the usual search incident, two different functions are performed by persons with the lawful power to act respectively: an authorization, *viz.,* a warrant, permits a search to be performed; and a search is conducted pursuant thereto. While infrequently, in certain well-defined situations, the former step may not occur, *see* part III of this opinion, *infra,* in legal theory these duties are not commingled in one seat of authority.

This Court has recognized the competency of a commanding officer to authorize a search of his unit. *United States v. Unrue,* 22 U.S.C. M.A. 466, 47 C.M.R. 556 (1973); *United States v. Hartsook,* 15 U.S.C.M.A. 291, 35 C.M.R. 263 (1965); *see* paragraph 152, Manual for Courts-Martial, United States, 1969 (Revised edition). Additionally, delegation of this command func-

tion has been allowed. *United States v. Drew,* 15 U.S.C.M.A. 449, 35 C.M.R. 421 (1965); *see* paragraph 152, Manual, *supra.* But for such an authorization to be *constitutionally* sound, such an officer must have been neutral and detached in law and in fact. By no definition was Lieutenant Hunter neutral and detached. Rather, his testimony regarding his general duties as squadron duty officer—to check the security of the areas, to look out for the welfare of the people, and to be watchful of illegal activity—as well as his testimony revealing his actions taken in this case and his thoughts upon which those actions were predicated, portray an officer whose responsibilities and whose reactions were akin to those of a policeman on a beat. As such, the lawfulness of his searching the room in question rests not upon his capability to have *authorized* a search, for he was not so neutral and detached, but upon the same narrowly defined exceptions to the warrant requirement as will sustain the actions of a police officer proceeding *sans* a warrant.

L.Ed.2d 564 (1971); *McDonald v. United States, supra.*

## III

As all three of the potential exceptions to the warrant requirement were treated by the United States Supreme Court in *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), under facts in all important respects indistinguishable from those of the instant case save the inability of Lieutenant Hunter to identify the precise source of the odor, I pause momentarily to relate the facts of *Johnson* from the Court's opinion.[10]

At about 7:30 p. m. Detective Lieutenant Belland, an officer of the Seattle police force narcotic detail, received information from a confidential informer, who was also a known narcotic user, that unknown persons were smoking opium in the Europe Hotel. The informer was taken back to the hotel to interview the manager, but he returned at once saying he could smell burning opium in the hallway. Belland communicated with federal narcotics agents and between 8:30 and 9 o'clock went back to the hotel with four such agents. All were experienced in narcotic work and recognized at once a strong odor of burning opium which to them was distinctive and unmistakable. The odor led to Room 1. The officers did not know who was occupying that room. They knocked and a voice inside asked who was there. "Lieutenant Belland," was the reply. There was a slight delay, some "shuffling or noise" in the room and then the defendant opened the door. The officer said, "I want to talk to you a little bit." She then, as he describes it, "stepped back acquiescently and admitted us." He said, "I want to talk to you about this opium smell in the room here." She denied that there was such a smell. Then he said, "I want you to consider

yourself under arrest because we are going to search the room." The search turned up incriminating opium and smoking apparatus, the latter being warm, apparently from recent use.

### A

Regarding the consent-search theory, the Supreme Court reached the following conclusion in *Johnson v. United States, supra* at 13, 68 S.Ct. at 368:

Entry to defendant's living quarters, which was the beginning of the search, was demanded under color of office. It was granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right. *Cf. Amos v. United States,* 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654.

Under the parallel facts established in Lieutenant Hunter's testimony, the occupants of the room in question had no choice but to open the door in response to his official command to do so. Whether Lieutenant Hunter's statement to open the door was an order or an official request, the result is the same:[11]

[I]n neither instance can . . . acquiescence be termed anything more than mere submission to lawful authority. As such, the search cannot be justified as one which flowed from appellant's freely given consent. *See generally Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

Correctly, the Government does not rely on this theory in the case at bar.

### B

The Government does rely on what it perceives to have been exigent circumstances requiring Lieutenant Hunter to act immediately to avoid the destruction of the contraband.[12] *See* paragraph 152, Manual

---

10. *Johnson v. United States, supra* at 12, 68 S.Ct. 367.

11. *United States v. Kinane,* 1 M.J. 309, 312 (C.M.A.1976) (footnote omitted).

12. This is the necessity-search theory, which this Court had occasion to treat recently in *United States v. Kinane, supra* at 312. (footnote omitted):

The necessity search, as it has come to be known, requires the existence of at least two

for Courts-Martial, United States, 1969 (Revised edition).

In examining for the presence of factors requiring immediate action by the law enforcement officers on the spot which would thereby justify not obtaining a warrant, the Supreme Court in *Johnson* said:[13]

There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with. But this is not such a case. No reason is offered for not obtaining a search warrant except the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate. These are never very convincing reasons and, in these circumstances, certainly are not enough to by-pass the constitutional requirement. No suspect was fleeing or likely to take flight. The search was of permanent premises, not of a movable vehicle. No evidence or contraband was threatened with removal or destruction, except perhaps the fumes which we suppose in time would disappear. But they were not capable at any time of being reduced to possession for presentation to court. The evidence of their existence before the search was adequate and the testimony of the officers to that effect would not perish from the delay of getting a warrant.

If the officers in this case were excused from the constitutional duty of presenting their evidence to a magistrate, it is difficult to think of a case in which it should be required.

The Supreme Court recently had an opportunity to extend the *Carroll* doctrine

(regarding warrantless searches of automobiles justified by inherent mobility of the auto) to a footlocker. *United States v. Chadwick, supra.* Instead of doing so, the Court looked to whether the facts showed a need to act immediately without a warrant. They concluded that no such need arose since the agents acquired control over the luggage, thereby precluding tampering therewith by an unauthorized person. The following portion of the Court's opinion in this regard sheds some light on where and why the *Carroll* line is drawn:

Our treatment of automobiles has been based in part on their inherent mobility, which often makes obtaining a judicial warrant impracticable. Nevertheless, we have also sustained "warrantless searches of vehicles . . . in cases in which the possibilities of the vehicle's being removed or evidence in it destroyed were remote, if not nonexistent." *Cady v. Dombrowski,* 413 U.S. 433, 441–442, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); accord, *South Dakota v. Opperman, supra* [428 U.S. 364 (1976)] at 367, 96 S.Ct. 3092, 49 L.Ed.2d 1000; see *Texas v. White,* 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 200 (1975); *Chambers v. Maroney, supra* [399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970)]; *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967).

The answer lies in the diminished expectation of privacy which surrounds the automobile:

"One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects . . . .. It travels public thoroughfares where

---

factors. Not only must the police official have probable cause to believe an individual is in possession of criminal goods, but the search also must be shown to be necessary to prevent the immediate removal or destruction of the evidence. *United States v. Soto,* 16 U.S.C.M.A. 583, 37 C.M.R. 203 (1967). In addition, the Supreme Court has not applied the necessity search doctrine to persons or dwellings, but instead has limited its scope to vehicles. *Compare Cardwell v. Lewis, supra* [417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325

(1974)] and *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), *with Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973); *Chambers v. Maroney,* 399 U.S. 42, 48–49, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), and *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). *See also Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

**13.** *Johnson v. United States, supra* at 14–15, 68 S.Ct. at 369.

both its occupants and its contents are in plain view." *Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality opinion).

433 U.S. at 12, 97 S.Ct. at 2484.

I do not believe that the expectation of privacy of a serviceperson in his closed barracks room is diminished to the extent that the Supreme Court finds it is in automobiles. Instead, except to the extent made absolutely necessary by the nature of an armed force[1] (*see* footnote 5, *supra*), such an expectation of privacy is not unlike that possessed by a civilian in his home, apartment, or hotel room. Thus, only where it can be shown factually that a true exigency existed to preserve criminal goods, evidence or contraband, will a warrantless search of such an area as this be permissible.

I believe the result reached in *Johnson v. United States, supra,* must obtain under these virtually identical facts.[14] No one was fleeing or likely to flee from the room; indeed, since both the squadron duty officer and the charge-of-quarters were present outside the door, one could have secured the room against such a possibility while the other sought proper authorization to proceed with a search of its interior. The search was of permanent premises, not a movable vehicle. As to the need for immediate action to prevent the removal or destruction of evidence or contraband, the Government urges:[15]

Under these circumstances the knock at the door of the first room checked, which produced no answer, could have alerted the occupants of neighboring rooms to take immediate action to dispose of the marihuana. Under this exigency the duty officer entered appellant's room, based upon probable cause, and searched for marihuana.

If, indeed, the knock did give rise to an "exigency" in this regard, it was one of the Government's own making and I do not believe that it is constitutionally permissible for the Government to *create* an exigency and then to rely thereon as a lawful basis for dispensing with the constitutional protection of a search warrant. Moreover, the Government in its argument simply is *speculating* that the knock *could* have alerted occupants of other rooms. Not only is there no factual basis in the record for such a speculation (note the music that was playing in the appellant's room at the time), but there is no reason for surmising that even if the knock had been heard, it would have "alerted" the neighbors that the authorities were searching out the source of the marihuana odor. There simply is no factual support for the suggestion that immediate action by Lieutenant Hunter was necessary to prevent the disposal of the marihuana being sought.

C

The Government also relies upon the search-incident-to-lawful-arrest theory to support its warrantless intrusion into the appellant's closed room. *See Gustafson v. Florida,* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973); *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *United States v. Brashears,* 21 U.S.C.M.A. 552, 45 C.M.R. 326 (1972). However, a lawful arrest has to *precede* a search in order for the search to have been "incident" thereto. *Sibron v. New York,* 392 U.S. 40, 63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *Johnson v. United States, supra; United States v. Kinane, supra* at 314. *Cf. Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973); *United States v. Kinane, supra* at 316–18. And the Govern-

---

14. Judge Cook has pointed to a factual variation between the present case and *Johnson* which he claims "distinguishes" the two. I believe, however, that it is a distinction without a difference. There is no hint in the *Johnson* opinion that the factor Judge Cook now finds so crucial was relied upon by the Court—either wholly or partially—as a basis for its conclusion that no adequate exigent circumstances were there present. The hard fact remains that in all respects which were material to the Supreme Court on this issue of existence of exigent circumstances, the cases are indistinguishable. So, then, must be the result.

15. Brief on Behalf of the United States Under Rule 43, page 7.

ment acknowledges in its brief before this Court that the order of events was the reverse:[16]

> Only after Lieutenant Hunter had ascertained that the odor of burning marihuana was even stronger in the room where appellant was found with four other servicemen and a German National woman did he tell everyone to "freeze". Appellant's conduct immediately before he was told to remove his shirt further alerted the duty officer for appellant was reluctant to move, reluctant to "show me his front" (R. 17), and gestered in his groin area. The testimony of Lieutenant Hunter reveals the restraints imposed on appellant, for everyone was told to freeze and empty their pockets, and after checking this material, looking around the room, and frisking two of the room's occupants he asked appellant to come forward (R. 17).

> Under these facts it is reasonable to conclude in accordance with the above quoted test enunciated in *United States v. Fleener, supra,* [21 U.S.C.M.A. 174, 44 C.M.R. 228 (1972)] that both appellant and the Lieutenant were aware that appellant's personal liberty had been restricted at the time of the Lieutenant's order to come forward. Appellant was under physical restraint at this point in time.

Moreover, not only was there no arrest preceding the search, but there was not even *probable cause* for an arrest prior to the beginning of the search. In fact, if there ever was probable cause to arrest the appellant specifically, *see Sibron v. New York, supra,* it was not until well after the entry into the room. Prior thereto, Lieutenant Hunter did not even know *who* was in the room, much less who had engaged in any criminal activity.

The Supreme Court reached the same conclusion in *Johnson v. United States, supra,* 333 U.S. at 15–17, 68 S.Ct. at 370. (footnote omitted):

> The Government contends, however, that this search without warrant must be held valid because incident to an arrest. This alleged ground of validity requires examination of the facts to determine whether the arrest itself was lawful.[17]

> [T]he Government quite properly stakes the right to arrest, not on the informer's tip and the smell the officers recognized before entry, but on the knowledge that she was alone in the room, gained only after, and wholly by reason of, their entry of her home. It was therefore their observations inside of her quarters, after they had obtained admission under color of their police authority, on which they made the arrest.

> Thus the Government is obliged to justify the arrest by the search and at the same time to justify the search by the arrest. This will not do.

Thus, inasmuch as the search of the quarters preceded the appellant's arrest, it may not be justified as incident to that arrest. *Sibron v. New York, supra; Johnson v. United States, supra.*

## IV

In conclusion, it is my judgment that when Lieutenant Hunter proceeded to enter the appellant's room in spite of his failure to obtain a search warrant—the assumed existence of probable cause for such a warrant notwithstanding—he violated the appellant's privacy protected by the Fourth Amendment, as none of the recognized, " 'jealously and carefully drawn' " warrantless exceptions[18] are sustainable on the

---

16.  *Id.* at 8 (footnote).

17.  Since the arrest was without a warrant, it could be valid only if Lieutenant Hunter had a "reasonable belief that an offense has been committed *and that the person apprehended committed it.*" (emphasis added). Article 7, UCMJ, 10 U.S.C. § 807.

18.  In his separate opinion, Chief Judge Fletcher applies. the doctrine of military necessity in upholding Lieutenant Hunter's entry into the appellant's room and the ensuing search thereof. However, I do not believe any greater necessity existed here than was evident in *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), which, on its facts, is as nearly parallel to the instant case as might be

facts of this record. *United States v. Watson,* 423 U.S. 411, 427, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (Powell, J., concurring), quoting *Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). As such, all evidence derived from that search is inadmissible against the appellant in his criminal trial.[19] *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Armstrong,* 22 U.S.C.M.A. 438, 47 C.M.R. 479 (1973). The law, as well as the rationale, of Mr. Justice Jackson's opinion in *Johnson v. United States, supra,* stands in good stead even today:[20]

The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that

evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. *When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.*

*Accord, United States v. Chadwick, supra.*

Therefore, I would reverse the decision of the Court of Military Review and dismiss the charge.

**19.** While Chief Judge Fletcher purports to square his action in this case with his position in *United States v. Thomas,* 1 M.J. 397, 402 (C.M.A.1976), thoughtful analysis reveals it cannot be done; rather, his opinion here constitutes an *extension* of his *Thomas* concept—a concept which I believe itself deviates from the Constitutional demands of the Fourth Amendment. *See* my opinion in *United States v. Roberts, supra* at 33–5 (1976). In *Thomas,* while he permitted commanders to intrude into private areas in the name of "military necessity," at least he foreclosed use in courts-martial of evidence discovered during these excursions because they contravened the Fourth Amendment. Now, however, the Chief Judge would find these constitutional oversteps *excepted* from the Fourth Amendment and, thus, not only permissible, but admissible.

possible, except for the fact that here the official entered a room in a military barracks. But in those cases in which the United States Supreme Court has recognized exceptions to the warrant requirement of the Fourth Amendment, it has nevertheless expressed a preference for adherence to the warrant requirement. Yet the warrantless entry of the police into the hotel room in *Johnson v. United States* was condemned. For the reasons therein expressed I find no exigency rising to the level of military necessity or other reasons to excuse the failure of Lieutenant Hunter to secure authorization to search from a neutral and detached authority. *See United States v. Unrue,* 22 U.S.C.M.A. 466, 47 C.M.R. 556 (1973) where Judge Quinn described two kinds of military necessity situations; and *United States v. Poundstone,* 22 U.S.C.M.A. 277, 46 C.M.R. 277 (1973). *See also Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**20.** *Johnson v. United States, supra,* 333 U.S. at 13–14, 68 S.Ct. at 369 (emphasis added).