UNITED STATES, Appellee,

v.

Anthony V. ACOSTA, Lance Corporal, U. S. Marine Corps, Appellant.

Dkt. No. 37382/MC.
CMR Dkt. No. 781403.

U. S. Court of Military Appeals.

August 3, 1981.

308

For Appellant: *Lieutenant Commander I. D. Warden, Jr.,* JAGC, USN (argued); *Captain Allan H. Meltzer,* USMCR (on brief).

For Appellee: *Lieutenant Anne L. Mac-Arthur,* JAGC, USN (argued); *Commander T. C. Watson, Jr.,* JAGC, USN (on brief).

## Opinion of the Court

EVERETT, Chief Judge:

Contrary to his pleas, the appellant was convicted by a special court-martial of wrongfully possessing 300.3 grams of marihuana and of wrongfully using marihuana, in contravention of Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892.[1] Thereupon, he was sentenced to a bad-conduct discharge, confinement at hard labor for 3 months, forfeiture of $265 pay per month for 3 months, and reduction to the lowest enlisted grade. The convening authority approved the findings and the sen-

tence, except for remitting all confinement in excess of 59 days, and the supervisory authority approved this action. The United States Navy Court of Military Review affirmed. *United States v. Acosta,* 6 M.J. 992 (N.C.M.R.1979).

Before us, the appellant questions "[w]hether the search of appellant's room was authorized by a neutral and detached magistrate?" Specifically, the appellant complains that Captain Stevens, who authorized the search and, indeed, who participated in it, had abandoned his neutrality and had taken on the role of a policeman. Thus, concludes the appellant, Captain Stevens' authorization to search his room was fatally tainted by his compromised detachment. *See United States v. Rivera,* 10 M.J. 55 (C.M.A.1980). After a careful review of the record, we conclude that, to whatever extent Captain Stevens performed as a policeman instead of a neutral and detached magistrate, he did so with probable cause and under exigent circumstances allowing him to proceed without authorization from a more detached official.

I

About 11:00 p. m. on the evening of October 7, 1977, PFC Grittman approached Gunnery Sergeant Armstrong who then was the Battalion Officer of the Day. Grittman inquired of Armstrong whether, if someone in a room was in possession of marihuana, others in the room would also be implicated thereby. Armstrong responded that this was possible. Grittman, who then was on restriction and was concerned about becoming involved in further difficulties, informed Armstrong that earlier the same evening Grittman's roommate, the appellant, had come into the room with about 14 or 15 plastic baggies of marihuana all rolled up in a newspaper and had placed the newspaper under the pillow on the appellant's bed. Grittman also apparently told Arm-

---

1. Originally, the appellant was charged with possessing 706 grams of marihuana, but the military judge reduced the quantity in his findings. *See* n. 5, *infra.* Additionally, the appellant was charged with possessing 706 grams of marihuana for purposes of sale, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934, but the judge acquitted the appellant of this allegation.

strong that the appellant had rolled a marihuana cigarette and had smoked it in the room. However, Armstrong did not ask Grittman about his previous experiences with marihuana or how he knew that the substance he observed was marihuana. Armstrong instructed Grittman to return directly to the room and to act as though nothing had happened. The sergeant also told Grittman that "we'd arrange it to where it would not be suspicious if I came up and checked the room, and he wouldn't get in any trouble by telling me what was going on." When Grittman left his office, Armstrong followed shortly behind in order to see if Grittman did as he had instructed. Though he lost sight of Grittman, when Armstrong reached the door to the appellant's room, he smelled the odor of burning marihuana.

At this point, Armstrong decided that he should relate the events to Captain Stevens, who then was the Regimental Field Officer of the Day. According to Stevens' testimony, Armstrong told him Grittman had revealed that earlier in the evening he had seen the appellant bring into the room 13 bags of marihuana wrapped in a newspaper and secrete the bundle under his pillow. Armstrong further advised Stevens that he, himself, had smelled the odor of marihuana in the hallway coming from the appellant's door.[2] Captain Stevens testified, in part, as to that conversation with Armstrong:

> He said that, well, GRITTMAN was on restriction at the time and was coming down to sign his restriction papers, and he asked Gunnery Sergeant ARMSTRONG what could happen if there was a bust to take place where someone was smoking marijuana or holding marijuana and that he was present even though he

wasn't smoking himself. Gunny ARMSTRONG, as I understand it, told him that he thought that he probably could be busted as well as the individual who was smoking in the room. At that point he told Gunnery Sergeant ARMSTRONG that there was smoking in the room and also about the quantity of marijuana underneath the pillow on the rack.

Captain Stevens had known Grittman for about two months at the time of the incident. Grittman had been transferred to his office as his clerk after someone at his previous assignment had recommended a psychological evaluation be done on him, but when Grittman had reported for duty, Stevens had interviewed him and had concluded that the evaluation was not needed. During the time frame in which Stevens had known Grittman and had been exposed to him on a daily basis, there had been no problems with Grittman's performance. As to his relationship with Armstrong, Stevens revealed that he had "known ... Armstrong very well for approximately a year" and that he thought "very highly of his credibility."

Captain Stevens testified that after receiving Armstrong's information, he had concluded that he had probable cause to search the appellant's room;[3] however, he did not then form the intent to do so. Instead, he wanted to go to the room himself and determine whether he could smell the odor of burning marihuana. If he could, he then intended to authorize a search. In case he should decide to proceed with a search, he wanted the military police present. Therefore, before doing anything further, he called the Provost Marshal Offi-

---

**2.** When Armstrong was asked on cross-examination whether Stevens had asked him about his own experience in smelling marihuana, Armstrong replied, "He knew that I had been at Casual Company before, and that kind of speaks for itself." Stevens, however, testified that he did ask Armstrong how he knew that the odor he smelled was marihuana and that Armstrong had responded that he had smelled it before.

**3.** As Regimental Field Officer of the Day, Captain Stevens was delegated the capability of authorizing searches in the regiment. Para. k, Special Orders and Instructions for the Regimental Field Officer of the Day, Encl. (1) to Regimental Order 1601.6K, Recruit Training Regiment, Marine Corps Recruit Depot, San Diego, California, and para. 4a(1), SOP for Male Recruit Training, Depot Order P1510.30. We need not consider here the validity of such delegation of the authority of a commander to order a search.

cer (PMO) and asked him to come over. When the PMO and several other military policemen arrived, the group left Stevens' office. Stevens stationed one military policeman outside the barracks at appellant's window as a precaution against any attempt by Acosta to rid himself of the substance. Then he sent two military policemen up a stairway at one end of the hall while he, Armstrong, and the PMO went up the stairway at the other end.

Within 15 minutes of Grittman's approach to Armstrong, these two groups converged on the appellant's doorway. While several members of the party testified that they could smell the odor of burning marihuana while standing there with the door closed, Captain Stevens testified that he could not. Therefore, he had Armstrong knock on the door. There is some question whether Armstrong knocked more than once with an intervening query by the appellant as to who was there, or whether Armstrong simply knocked once. In any event, Armstrong testified that he did not identify himself when he knocked because he "didn't want [the appellant] to get rid of anything."

Pursuant to the knock, the appellant opened the door about halfway. At that moment, Stevens testified that he "smelled the very distinct smell of marihuana odor coming out of the room."[4] Armstrong opened the door the rest of the way and the party entered the room. Stevens said that "at that point"—while entering the room—he "verbally authorized a search of the room."

Only appellant and Grittman were in the room. Acosta then tossed a black shaving kit onto the bed and said, "This is what you're looking for." After asking, "Is that all there is?", Stevens went to the pillow on the appellant's bed, lifted it, and revealed the newspaper bundle. At the time, the appellant was only about 2 or 3 feet from the pillow, but Stevens testified that he never really feared that the appellant could destroy the evidence. The military police then placed the appellant under apprehension and Stevens ordered a search of the entire room, which, however, awaited the arrival of a Criminal Investigation Department (CID) agent who took charge of the scene. At this point Stevens executed a written authorization for the CID to search the room, and the search uncovered a marihuana roach in an ashtray next to the appellant's bed. It is the marihuana found in the appellant's room which he was convicted of possessing.[5]

At the time of these events, there existed a regimental directive[6] that a commander's grant of permission to search be recorded in writing. When questioned by defense counsel as to why this had not been done before the search of the appellant's room had been conducted, Captain Stevens said that at the time he had not understood the regulation to require that the writing be executed *before* the search. When defense counsel asked Armstrong why he had not consulted the log books and directives regarding written authorization to search, Armstrong replied that there had been a very short time between Grittman's tip and Armstrong's personally smelling the odor of burning marihuana and he simply had wanted to "get this thing under way and not lose anything."

## II

■ Sergeant Armstrong had intended to gain access into Acosta's room by a pretext that he was there for a bed-check to ascertain if Acosta's roommate, PFC Grittman, was complying with the conditions of his restriction. However, use of this sub-

---

4. Stevens stated at trial that he has smelled the odor of burning marihuana during instruction he had received on contraband while he was a student at the Naval Justice School.

5. Evidence of additional marihuana found in the trunk of the appellant's car was suppressed by the judge on motion of the defense, leading to a reduction in the findings of the amount of marihuana the appellant was charged with possessing. *See* n. 1, *supra*.

6. Para. 4a(2), Depot Order P1510.30, *supra*. *See* para. k, Special Orders and Instructions for the Regimental Field Officer of the Day, *supra*.

terfuge was apparently unnecessary. When Sergeant Armstrong knocked on the door, Acosta opened it without ascertaining his identity, much less his purpose. Anyone—including a criminal investigator—is free to knock on a door, at least if there are no posted instructions to the contrary. If the person inside opens the door without determining the identity of the one who knocks, then to the extent of any observations made when the door is opened, he was voluntarily relinquished his privacy by his own actions. In short, since Acosta opened the door of his barracks room without even ascertaining the identity of the person seeking access, he has no legally cognizable complaint that his privacy was invaded because the odor of marihuana floated out through the open door into the hallway. When Captain Stevens, who was standing in the hall near the door, recognized the odor of marihuana, he had probable cause to apprehend appellant for a crime then in progress.[7] The door was open, and Acosta was in full view. Under such circumstances, there was no need for Captain Stevens to delay the apprehension in order to seek any further authority to enter.

▮ Incident to the apprehension based on probable cause, Captain Stevens and his cohorts could lawfully conduct a search of appellant's person and of the area within his immediate control in order to find weapons or destructible evidence. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *United States v. Cordero,* 11 M.J. 210 (C.M.A.1981). It is of no moment that Captain Stevens indicated at one point in his trial testimony that, once he had entered the room, he did not fear that appellant would destroy the evidence which the captain believed to be under his pillow, for the authority to search this area within appellant's control follows from the apprehension itself and not from a specific fear that the person arrested possesses weapons or is capable of destroying evidence. *United States v. Robinson,* 414

U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida,* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973); *United States v. Cordero, supra.* In view of appellant's proximity to the bed and pillow, the area where Captain Stevens found the marihuana was subject to Acosta's immediate control for purposes of a search incident to apprehension. *Chimel v. California, supra; United States v. Campbell,* 581 F.2d 22 (2d Cir. 1978); *United States v. Mancillas,* 580 F.2d 1301 (7th Cir. 1978), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978); *United States v. Savage,* 564 F.2d 728 (5th Cir. 1977); *Watkins v. United States,* 564 F.2d 201 (6th Cir. 1977), *cert. denied,* 435 U.S. 976, 98 S.Ct. 1626, 56 L.Ed.2d 71 (1978).

▮ Also, it is of no legal consequence that the appellant was not formally placed under apprehension until immediately following the search under his pillow. In a case factually analogous to the one at bar, the Supreme Court had this to say:

> Once petitioner admitted ownership of the sizable quantity of drugs found in Cox's purse, the police clearly had probable cause to place petitioner under arrest. Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa.

*Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980). *Cf. Dickey v. United States,* 332 F.2d 773 (9th Cir. 1964), *cert. denied,* 379 U.S. 948, 85 S.Ct. 444, 13 L.Ed.2d 545 (1964).

### III

If, as he had originally planned, Sergeant Armstrong had gained access to Acosta's room by means of a pretense as to his identity or purpose, then the situation might be different. We have emphasized elsewhere that this Court will not allow

---

7. "Any person authorized under regulations governing the armed forces to apprehend persons subject to this chapter or to trial thereunder may do so upon reasonable belief that an offense has been committed and that the person apprehended committed it." Art. 7(b), Uniform Code of Military Justice, 10 U.S.C. § 807(b).

otherwise lawful inspections to be utilized as a subterfuge to look for evidence sought in a specific criminal investigation. *United States v. Middleton*, 10 M.J. 123 (C.M.A. 1981). However, there is precedent for allowing undercover agents to gain access to a dwelling by misrepresenting their identity or purpose and later testifying to their observations. *See, e. g., United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963). Moreover, in interpreting 18 U.S.C. § 3109, which pertains to the breaking of doors or windows of a house in executing a search warrant, several courts of appeals have ruled that entry gained by ruse or deception does not violate the statute. *See, e. g., United States v. DeFeis*, 530 F.2d 14 (5th Cir. 1976), *cert. denied*, 429 U.S. 830, 97 S.Ct. 92, 50 L.Ed.2d 95 (1976); *Smith v. United States*, 357 F.2d 486, 488 n. 1 (5th Cir. 1966); *Dickey v. United States, supra; Jones v. United States*, 304 F.2d 381 (D.C. Cir.1962), *cert. denied*, 371 U.S. 852, 83 S.Ct. 73, 9 L.Ed.2d 88 (1962).[8] The case at hand does not present this issue in its starkest form because, even if a pretense had been used by Armstrong to gain access, it would have been with the full concurrence of PFC Grittman, who, as an occupant of the room, could authorize a lawful entry into the room. *Cf. United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Campbell*, 575 F.2d 505 (5th Cir. 1978).

## IV

▮▮▮ Finally, even if Sergeant Armstrong and Captain Stevens had attempted to search the room against the express wishes of both occupants and without any purpose of apprehending appellant, the search would nonetheless be reasonable. In this regard, we rely on the exception for warrantless searches by law enforcement agents when they have probable cause and the circumstances are exigent. Under this recognized exception, a search performed under similar circumstances by law enforcement agents in the civilian community would probably be deemed reasonable. *See, e. g., United States v. Campbell, supra* (discussing "exigent circumstances"). In any event, within the military society the conditions are exigent. As we have made clear heretofore, while the Fourth Amendment shields not only the American civilian but also the American serviceperson, the *application* of that protection is not always identical in the civilian and military sectors. As a unanimous Court recently recognized, that application must "take into account the exigencies of military necessity and unique conditions that may exist within military society." *United States v. Middleton, supra* at 127.

Such an exigency faced Captain Stevens in the case at hand.[9] At the time of the incident, Stevens was the Regimental Field Officer of the Day. As such, he was responsible for the safety, security, and well-being of the unit. In that capacity, he received information from a senior noncommissioned officer—whom he had known personally for over one year and believed to be highly credible—that a member of the unit had reported seeing the appellant bring marihuana into his barracks room and smoke a joint of marihuana. Stevens also knew the informant and believed him to be credible. The reliability of the tip was supported by the circumstances under which it was given—that is, that the individual al-

---

**8.** It has been held that 18 U.S.C. § 3109 has no application to the military. *United States v. Wallis*, 44 C.M.R. 586 (A.C.M.R.1971), *pet. denied*, 21 U.S.C.M.A. 618, 44 C.M.R. 940 (1971). Also relevant to the notice of purpose and authority required for a valid arrest or seizure in a narcotics case is *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

**9.** For purposes of our analysis, we will assume that Captain Stevens did not act with the neutrality and detachedness expected of an authorizing official, *see United States v. Rivera*, 10 M.J. 55 (C.M.A.1980); *United States v. Ezell*, 6 M.J. 307 (C.M.A.1979), and, therefore, that his entering the room and his actions in the room were without a search authorization. Of course, this search and seizure antedated *Ezell*, which has not been applied retroactively.

ready was on restriction and was seeking to avoid any further trouble—and by the detection of the odor of burning marihuana just outside the appellant's closed barracks door by a noncommissioned officer who was familiar with such an odor. Within minutes of learning this, Captain Stevens himself, upon the voluntary opening of the barracks room door by the appellant, detected the distinctive odor.

■ This situation is similar in many respects to that before the Court in *United States v. Hessler*, 4 M.J. 303 (C.M.A.1978), *reconsidered*, 7 M.J. 9 (C.M.A.1979). As Chief Judge Fletcher explained there, the obligation of a military commander or an officer in charge to assure the readiness of a military unit to fulfill its military mission is a consideration wholly unknown in the civilian community which bears on the reasonableness of searches and seizures in the military. 4 M.J. at 308; 7 M.J. at 10. *Accord, United States v. Middleton, supra.* That concern with the ability of the military to perform its readiness mission must, necessarily, begin with the individual service member because of "the interdependent relationship of each serviceperson's duty to act in concert with other servicepersons." 4 M.J. at 308.

■ We have had occasion recently to acknowledge the crippling effect that the sale and use of contraband drugs in the military environment can have—and, indeed, is having—on the ability of our defense forces to fulfill their constitutional duty to defend this country. *See United States v. Trottier*, 9 M.J. 337 (C.M.A.1980). With all this in mind, we can conceive of no greater exigency requiring immediate action than the perceived present active use of debilitating drugs by specific servicepersons. To require a person in authority who is exposed to such an emergency situation

to put the situation "on hold" while he seeks authorization from a magistrate would only exacerbate the threat.[10] The reasonable application of the Fourth Amendment does not demand this.[11]

V

The decision of the United States Navy Court of Military Review is affirmed.

Judge COOK concurs.

FLETCHER, Judge (concurring):

I agree with the majority that Captain Stevens acted reasonably in this case. Upon smelling the activated marihuana, he was entitled as part of his command responsibility to immediately enter the appellant's barracks room to prevent its continued activation. Such a limited governmental intrusion is justified by the military exigency presented to command. *See United States v. Hessler*, 7 M.J. 9, 10–11 (C.M.A.1979). In view of the information earlier provided to him, he could also lawfully arrest the appellant and search the area within his control. *See generally United States v. Cordero*, 11 M.J. 210 (C.M.A.1981). The marihuana for which the appellant was convicted was either within his area of control or in plain view.

Part IV of the majority's opinion is dicta. In *United States v. Hessler, supra* at 11 (footnote omitted), I stated in similar circumstances:

> Moreover, if a more extensive search of the barracks room is needed for law enforcement purposes to discover dormant marihuana and is justified by probable cause, a search authorization must be obtained through the most reasonable procedures available at the military installation which are authorized by military law.

I continue to subscribe to this position, particularly where the marihuana is no longer in an activated state, an arrest is accom-

10. It is in this respect, as Judge Cook recognized in his opinion in *United States v. Hessler*, 4 M.J. 303, 306 (C.M.A.1978), *reconsidered* 7 M.J. 9, 11 (C.M.A.1979), that situations such as these differ from that presented to the Supreme Court in *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

11. By the same logic, we believe that the expressed prescription in the regimental directives that a probable-cause search should be authorized in writing, see n. 6, *supra*, does not contemplate such exigent circumstances. *Cf. United States v. Hood*, 7 M.J. 128 (C.M.A. 1979).

plished, and the room can be easily secured prior to the more extensive search of the barracks room. This was the situation presented in appellant's case. *See Payton v. New York*, 445 U.S. 573, 587–89 (majority) and 617–19, 100 S.Ct. 1371, 1380–81, and 1396–97, 63 L.Ed.2d 639 (White, J., dissenting) (1980). Once the exigency is dissipated, the right to search without a search authorization is also extinguished. *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). *See Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).