UNITED STATES

v.

Captain Michiel L. DILLON, 308–48–8248 FV United States Air Force.

ACM 22756 (reh).

U.S. Air Force Court of Military Review.

Sentence Adjudged 4 June 1982.
Decided 20 Sept. 1983.

Appellate Counsel for the Accused: Colonel George R. Stevens and Major Richard A. Morgan.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert and Major Michael J. Hoover.

Before KASTL, RAICHLE and SNYDER, Appellate Military Judges.

DECISION UPON REHEARING

KASTL, Senior Judge:

Questions of post-trial delay, multiplicity, and search and seizure are before us in this case. Finding no error, we affirm.

Captain Dillon was convicted, despite his pleas, of wrongful use and possession of marijuana (Article 134, UCMJ) 10 U.S.C. § 934, and conduct unbecoming an officer and gentleman by wrongful and dishonorable use of marijuana in the presence of an enlisted member (Article 133, 10 U.S.C. § 933). He was sentenced to dismissal from the service.[1]

1. This case has been before us twice before.

The accused was originally tried on similar

## I

The defense mounts a broadside Fourth Amendment attack on the military judge's ruling declining to suppress evidence of drug abuse seized by government investigators. A detailed recitation of the facts developed at trial is necessary to evaluate these search and seizure matters.

Technical Sergeant George L and Staff Sergeant Renee D, platonic friends, occupied an off-base apartment in Izmir, Turkey, in June 1979. They shared the rent. The apartment contained separate bedrooms and a common kitchen, bathroom, and living room.

Sometime in mid-June or early July 1979, the accused officer moved into D's bedroom. Thereafter, Sergeant L smelled incense eminating from there and noticed that the door was double-locked; he suspected drug abuse. L took his concerns to the Office of Special Investigations (OSI); he was advised to seek evidence of drug use in the apartment's common areas. At military drug classes, L had smelled marijuana and viewed pictures of hashish. The OSI gave him a refresher demonstration of burning marijuana. L denied ever using any prohibited substances himself.

During July and the first part of August 1979, L retrieved various items from the apartment's common areas, including a needle, glass, cellophane, and tinfoil. Field tests of these items confirmed marijuana residue.

One day in this timeframe, L told the accused he felt depressed; the accused suggested that L try to get "high," as he and D did, because it would change L's bleak outlook on Izmir. Sergeant L indicated that D on several occasions had previously invited him to smoke marijuana or hashish. L conceded that prior to 13 August 1979 he neither saw the accused with marijuana or

hashish nor smelled it coming from D's bedroom.

On 13 August, L saw the accused at the apartment rolling small balls of what appeared to be hashish. The accused asked if L wanted to smoke some hashish with him and D that night. Declining, L informed the OSI of what had occurred. After dinner, D called him back to the bedroom; Sergeant L saw D and the accused sitting on the floor. The accused was cutting hashish balls, and smoking the substance. L was asked to smoke but declined. There was a bittersweet odor, similar to what L had smelled in training classes. After about 10 minutes, L left and called the OSI, relating what he had observed and smelled.

OSI agents R and F proceeded to the apartment, while Agent LR went to brief a Major Keller, who had been delegated search authority. When the two OSI agents arrived, Sergeant L opened the door and invited them in. L pointed down the hall to the bedroom door. R and F proceeded to the door, noticed that it was slightly open (about an inch or two) and detected a very strong odor of burning marijuana coming from the room. Both agents testified they could not see into the bedroom, even with the door slightly ajar. R knocked on the bedroom door; the response from inside was either "Hello" or "Yes" in a questioning tone. R entered the room, identified himself to the accused, and showed his badge. The accused and D were sitting on the floor in the center of the room. The accused was glassy-eyed, slow in movement, and apparently intoxicated.

Between the accused and D was what appeared to be a hashish ball and paraphernalia for smoking it. Both R and F had received training in identification of such substances; each had been involved in over 100 drug cases. The two agents smelled the ball; in their opinion, it was hashish.

charges in December 1979. The original sentence, as approved, was a dismissal and forfeiture of $500.00 per month for 12 months. We affirmed in April 1981.

Subsequently, we granted the accused's motion to reconsider his conviction in light of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct.

1880, 68 L.Ed.2d 378 (1981). Having so reconsidered, we found that the accused's confession was improperly admitted in evidence against him. A rehearing was ordered.

In June 1982, 11 M.J. 922, that rehearing occurred. The accused, despite his pleas, was found guilty. He was sentenced to a dismissal.

At that point, Agent LR arrived at the apartment with a search authorization from Major Keller. Entering the bedroom, LR saw the same items as had been observed by the other agents.

Agent F seized the items in plain view; LR searched the room itself (more hashish and paraphernalia were found). In addition, after LR arrived with the search authorization, R had the accused empty his pockets; in his wallet was a plaque, which later proved to be hashish.

Based on these facts, the accused asserts that the military judge erroneously failed to suppress evidence of drug abuse seized as the result of an unlawful search.

### Entry Into the Apartment

 The first question we analyze is whether OSI investigators were legitimately on the premises at the Izmir apartment, having been invited to enter by Sergeant L, as co-tenant. We find military and civilian precedents clearcut—the investigators' entry into the apartment was legitimate and reasonable under the circumstances because of valid consent given to enter. *United States v. Mathis,* 16 U.S.C.M.A. 522, 37 C.M.R. 142, 144 (1967) (homeowner gave consent to premises where she exercised control); *see also United States v. Berry,* 6 U.S.C.M.A. 609, 20 C.M.R. 325 (1956) (two guests in hotel room; one consents, binding accused; *see generally United States v. Boyce,* 3 M.J. 711 (A.F.C.M.R.1977); *United States v. Childress,* 2 M.J. 1292 (N.C.M.R. 1975). *See Feaster v. State,* 635 P.2d 617 (Okl.Cr.1981) (no warrant needed; consent by co-tenant); *People v. Adams,* 91 Ill. App.3d 1059, 47 Ill.Dec. 605, 415 N.E.2d 610 (1980), (no warrant needed; another tenant admitted police); *State v. Graffice,* 294 N.W.2d 324 (Minn.1980) (no warrant needed, consent by co-occupant); *see also Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (cousin and mother consented to search of appellant's duffel bag; Court declined to "engage in such metaphysical subtleties" as to who had permission to use which compartments of the bag).

### Warrantless Entry Into the Bedroom

We next consider whether the OSI agents, once legitimately in the apartment, could lawfully enter the bedroom without a warrant. We answer this question affirmatively.

Warrantless searches are addressed in Mil.R.Evid. 315. The apposite portion, subsection 315(g), relates that:

(g) *Exigencies.* A search warrant or search authorization is not required under this rule for search based upon probable cause when:

(1) *Insufficient time.* There is a reasonable belief that the delay necessary to obtain a search warrant or search authorization would result in the removal, destruction, or concealment of the property or evidence sought . . . .

Since Rule 315(g) restates present law, we need not pause to distinguish pre-Rules cases from more recent precedents. Having said this, we turn to applicable case law.

In *United States v. Acosta,* 11 M.J. 307 (C.M.A.1981), the odor of marijuana floated out through an open door into a hallway; a captain, standing in the hall near the door, recognized the odor. The door was open and the accused in full view. The Court found that the officer had probable cause to apprehend the accused for a crime then in progress; under such circumstances, there was no need for the captain to delay the apprehension to seek further authority to enter. *United States v. Acosta, supra,* at 311. The subject of exigencies in the military environment in drug cases was developed as well; Chief Judge Everett counselled that

We can conceive of no greater exigency requiring immediate action than the perceived present active use of debilitating drugs by specific servicepersons. To require a person in authority who is exposed to such an emergency situation to put the situation "on hold" while he seeks authorization from a magistrate would only exacerbate the threat. The reasona-

ble application of the Fourth Amendment does not demand this (footnotes omitted). *United States v. Acosta, supra,* at 313.

Similarly, in *United States v. Hessler,* 4 M.J. 303 (C.M.A.1978), a squadron duty officer noticed the odor of burning marijuana in the barracks; his detection narrowed down to four closed doors. A warrantless entry into the correct room was approved as "reasonable and constitutionally valid." *United States v. Hessler, supra,* at 306. *See also United States v. Mitchell,* 12 M.J. 265 (C.M.A.1982) (off-post apprehension at private apartment; exigent circumstances, drugs); *United States v. Phinizy,* 12 M.J. 40, 42 (C.M.A.1981) (entry and arrest in barracks without warrant; exigencies); *United States v. Lawless,* 13 M.J. 943, 944–945 (A.F.C.M.R.1982) (Security Police smelled burning marijuana, odor coming from residence in enlisted housing area; police properly went onto the premises to investigate); *United States v. Thompson,* 12 M.J. 993, 995 (A.F.C.M.R.1982) ("Oh, oh it's the cops;" open door; ample probable cause to believe offense of possession occurring in police presence; lawful entry into barracks room).[2]

■ We apply such precedent to the present case: Here, once in the apartment, Agents R and F smelled the odor of mari-

juana coming through the slightly-open bedroom door; both had training and experience in identifying that odor. They were already investigating since they also knew of L's earlier report that the accused possessed hashish balls and was planning to use marijuana that very evening. Based upon these facts, we hold that the investigators lawfully entered the bedroom. A search warrant or authorization was not required since delay necessary to obtain such a document could have resulted in the removal, destruction, or concealment of the substance. Mil.R.Evid. 315(g).[3] *See* LaFave, Search and Seizure § 6.1 at 392.

### Seizure of Items in the Bedroom

■ Upon entry into the bedroom, the OSI agents could have seized evidence of a crime which appeared in plain view. Mil.R. Evid. 316(d)(4). *See United States v. Burnside,* 15 U.S.C.M.A. 326, 35 C.M.R. 298, 305 (1965); *United States v. Gladdis,* 11 M.J. 845, 848 (A.C.M.R.1981); *see generally United States v. Rodriguez,* 8 M.J. 648, 652 (A.F.C.M.R.1979) and "Search and Seizure—a Primer—Plain View," The Advocate, Vol. 13, No. 5, September-October 1981, pp. 357–361. The two agents on the scene delayed any further activity, however, until Agent LR returned with Major

---

**2.** Professor LaFave offers a slightly different analysis of this area. He notes that law enforcement practices need not be "reasonable" under the Fourth Amendment unless they are truly either "searches" or "seizures." He then suggests that when a law enforcement officer, while lawfully present, is able to detect something by utilizing one or more of the senses, this does not constitute a true Fourth Amendment "search". Therefore, LaFave suggests, there is no "reasonable expectation of privacy" from lawfully positioned agents with "inquisitive nostrils." *See generally* LaFave, Search and Seizure, § 2.1 at 221–222 and § 2.2 at 240–241 and 247; *United States v. Hessler,* 4 M.J. 303, 304 (C.M.A.1978). *See also United States v. Johnston,* 497 F.2d 397 (9th Cir.1974).

**3.** Appellate defense counsel argue in their able brief that the exigency exception to the requirement for probable cause is inapplicable to this case:

If any exigency existed, it was precipitated by the agents unnecessarily revealing their

presence to the appellant and [D].... It is quite apparent that [D] and the appellant were in no hurry to consume the substance. Resort to a search warrant was very practicable under the facts of this case. The items seized, although they were being slowly consumed, were not in the process of being destroyed.

We believe the defense's reliance is misplaced. The cases do not so narrowly define "exigency." Moreover, a felony was being committed in the investigators' presence and the illegal substance was being destroyed through consumption and transformation into residue. Precedent is clear that government agents, facing such an emergency situation, need not freeze to await the arrival of a search authorization. *United States v. Acosta,* 11 M.J. 307 (C.M.A.1981); *see also United States v. Phinizy,* 12 M.J. 40 (C.M.A.1981); *United States v. Lawless,* 13 M.J. 943, 945 (A.F.C.M.R.1982). *See also United States v. Mitchell,* 12 M.J. 265, 270 (C.M.A.1982).

Keller's authorization. We believe it abundantly clear that such warrant was valid and such items properly seized.[4] *See Washington v. Chrisman,* 455 U.S. 1, 102 S.Ct. 812, 816, 70 L.Ed.2d 778 (1982); *United States v. Sanchez,* 10 M.J. 273, 274 (C.M.A. 1981).

4. Major Keller had received briefings over the immediate past four days from Office of Special Investigations agents concerning this situation. Factually, on 13 August 1979, Major Keller: (1) knew that the Izmir apartment at 1377 SOKAK 7–1 was occupied by L, D, and the accused; (2) knew the relationship of the suspected individuals and their living arrangements; (3) knew that the co-tenant/informant—a good citizen—had been briefed on drug recognition and was himself free of drug activity; (4) knew that this informant had provided several items he stated came from the common areas of the apartment—they field-tested positive for illegal substances; (5) knew that a second informant had provided signed, sworn statements asserting the use of illegal substances by D and the accused; (6) knew that L also had signed sworn statements relating information on drug abuse, including the fact that D and the accused had offered L some marijuana; and (7) knew that L was freshly asserting that he had seen the accused, who was residing in the apartment, in possession of a hashish ball at approximately 1730–1800 hours, that the accused was intending to smoke that night, and that the accused had offered L the chance to smoke hashish also. The briefing to Major Keller occurred at about 1930 hours. Keller was informed that the OSI agents expected to find the illegal substances in D's room. Keller discussed the reliability of the information and the informant with the agents; earlier, on 10 August, he also had spoken to a judge advocate prior to signing any authorization.

The defense particularly stresses that Major Keller neither asked the agent why L was to be believed nor established the informant's prior "track record," if any.

Evaluating all these matters, we factually find beyond scruple that Major Keller had probable cause to authorize the 13 August search. The very recent case of *United States v. Tipton,* 16 M.J. 283 (C.M.A.1983) is directly on point, in addressing the reliability of such a tipster.

In *Tipton,* the Court of Military Appeals addressed the well-known two-pronged test enunciated in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), as clarified by *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 2327, 76 L.Ed.2d 527 (1983).

Summarizing, we have carefully assessed the many sided and skillful defense attack on the ruling of the military judge admitting the evidence seized here. We are convinced that the military judge had more than sufficient evidence to justify his ruling admitting the evidence in question. Recent

The Court of Military Appeals viewed Supreme Court guidance in this manner:

Eschewing a more 'rigid' approach, the Supreme Court reiterated that 'the central teaching of ... [their] decisions bearing on the probable cause standards is that it is a "practical, nontechnical conception"'.

Furthermore:

... the Court "abandon[ed] the 'two-pronged test,'" ... which encouraged an excessively technical dissection of informants' tips, with undue attention being focused on isolated issues that cannot sensibly be divorced from the other facts presented to the magistrate.

*United States v. Tipton, supra,* at 286. The Court of Military Appeals then concluded that the Supreme Court was reaffirming a totality-of-the-circumstances approach. *United States v. Tipton, supra,* at 286.

On the facts in *Tipton,* the Court of Military Appeals applied Supreme Court precedents and found that—under such totality-of-the-circumstances litmus test—a tip supplied by an identified service member whose reliability had *not* been previously established indeed provided probable cause for apprehension for possession of marijuana: That service members' credibility was sufficient to overcome his lack of proven reliability since military members are "in a poor position to fabricate with impunity." *United States v. Tipton, supra,* at 287. This is so because there is a degree of accountability in a military environment unparalleled in civilian society. Thus, it was unnecessary for the military police to develop a lengthy "track record" on the informant before crediting his information. *United States v. Tipton, supra* at 287.

In the instant case, we also are persuaded that more than sufficient factual bases were present from which an observer could conclude that criminal activity was afoot. *See generally* LaFave, Search and Seizure § 3.3 (1978) and AFP 111–8, Evidence, November 1973, para. 29–3c.

Neither do we find a delegation of authority problem here. These events occurred prior to the date of *United States v. Kalscheuer,* 11 M.J. 373 (1981), which precludes such delegations of authority. The *Kalscheuer* rule is to be applied prospectively. *United States v. Tipton, supra,* at n. 2; *United States v. Ramsey,* 13 M.J. 158 (C.M.A.1982).

precedents of the Court of Military Appeals and this Court are more than persuasive; they are overwhelming. The accused's contention is rejected.

## II

■ The accused further argues that the wrongful use and possession specifications (Article 134) duplicate each other and duplicate the wrongful and dishonorable use of marijuana in· the presence of an enlisted member offense (Article 133) and should be dismissed.

We disagree. An excellent analysis of charging acts under a specific article and under Article 133 appears in *United States v. Clark,* 15 M.J. 594 (A.C.M.R.1983); we find such reasoning eminently persuasive. *See also United States v. Rose,* 6 M.J. 754, 757 (N.C.M.R.1978).

## III

The accused also asserts that the findings and sentence should be disapproved because of the 269-day delay between the conclusion of his trial and the convening authority's action. On the facts here, we find no prejudice.

By our calculations, the Government was responsible for 237 days of delay between completion of trial and the action of the convening authority. Relevant. dates are these:

| | |
|---|---|
| 2–4 June 1982: | Trial |
| 16 July 1982: | Military Judge authenticates record of trial |
| 4 January 1983: | Date of 23-page Staff Judge Advocate Review |
| 18 February 1983: | Convening authority action |

Appellate Government counsel rightly concede in their brief the "regrettably long" delay, one "not a model for processing" as to the 16 July 1982 to 4 January 1983 timeframe.

■ By way of affidavit, the accused—a nurse—asserts prejudice since delay in the review process allegedly caused prospective civilian employers not to hire him; this was supposedly due to uncertainty of when he would be available. The affidavit further states that the accused would probably lose his current nursing license if the conviction became known to his endorsing state.

On these facts, we perceive no harm to the accused attributable to post-trial delay. The loss of possible civilian nursing employment is not due to any such delay; *to the contrary, it is a natural consequence of state decertification processes which would ultimately flow from the court-martial conviction itself.* Such a state of affairs is unaffected by the delay.

There is an additional reason why no prejudice exists here. Admittedly, the otherwise-excellent Staff Judge Advocate's Review was moving at a snail's pace; however, during all this time, the accused received full pay and allowances. He was neither confined during this time nor in any way restricted. Accordingly, we discern nothing like the harm asserted in *United States v. Clevidence,* 14 M.J. 17 (C.M.A. 1982). There, the accused—who had been confined for 77 days—later claimed hinderance in finding employment; however, Clevidence was in a leave-without-pay status and at least a perception of prejudice thus existed. Such is not the case here. In sum, given the lack of post-trial confinement, length of the record, complexity of the issues, absence of defense objection to sluggish processing in his response to the Staff Judge Advocate's Review, and the serious nature of the charges concerning this officer-accused, dismissal of the charges is unwarranted.

There is a further concern as to this issue. The record of trial exhibits another delay of some two months between convenor action and receipt of the record by this Court. As for this timeframe, in which the record was in limbo prior to its arrival in Washington, we will measure for prejudice. We addressed the subject of these delays in mailing records in some depth in *United States v. Milan,* 16 M.J. 730 (A.F.C.M.R.1983) and will not repeat those observations here. *See also United States v. Rose,* 16 M.J. 568 (A.C.M.R.1983). Measuring for prejudice— while again recording our emphatic disap-

proval of inordinate delays after the convenor acts—we discern no prejudice.

### IV

Finally, the accused argues that the military judge erred by failing to grant a defense motion to dismiss the charges or strike the testimony of Government witnesses relating to real evidence intentionally destroyed and documentary evidence lost. The issue was cogently resolved in the Staff Judge Advocate's Review. We adopt that reasoning as our own and are independently convinced there was no error at this juncture.

### V

The additional matters raised in the trial defense counsel's *Goode* response including clemency for this officer-accused who encountered D, a female enlisted member he described as a "provocative temptress," have been considered and resolved adversely to the accused.

The findings of guilty and the sentence are

AFFIRMED.

RAICHLE and SNYDER, Judges, concur.